1

Mr. Piero A Bugoni Pro - Se
160 W. Camino Real
#191
Boca Raton FL 33432

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**JUL 22 2025**

KEVIN P WEIMER, Clerk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT

## IN AND FOR NORTHERN THE DISTRICT OF GEORGIA

Piero A. Bugoni Individually,
PLAINTIFF

vs.

Sterling Infosystems Inc.
First Advantage Inc.
DEFENDANT

Case No.:  **1:25-CV- 4072**

**COMPLAINT AND PETITION**

**FOR DECLARATORY JUDGMENT**

**SPEEDY HEARING REQUESTED
PER FRCP 57**

### Jurisdiction

1)   This Court has Federal Question and Diversity Jurisdiction to hear this claim because

Plaintiff alleges violations of Federal Law, (FCRA) by defendant, and because the parties

herein do reside in and do business from multiple of The United States.

### Venue

2)   Venue is proper herein because defendant First Advantage is a corporation which is

headquartered in and operates Defendant Sterling Infosystems from Atlanta Georgia.

28

1

## Parties

3)   Plaintiff Piero Bugoni is an individual person appearing herein in his individual capacity.

4)   Defendant Sterling Infosystems Inc. Is the party identifying as the Consumer Reporting Agency furnishing consumer investigation reports relating to Plaintiff that are the subject of this matter.

5)   Defendant First Advantage Corporation is a Consumer Reporting Agency, and is the parent corporation to "Sterling", "Sterling BackCheck", and "Sterling Check", a company or service that furnishes consumer reports to a party involved in a prospective business relationship with Plaintiff. Defendant First Advantage is believed to be the same entity as defendant Sterling Infosystems. See: https://investors.fadv.com/news-releases/news-release-details/first-advantage-completes-acquisition-sterling-check-22-billion

## Specific Terms As Used Herein

6)   "Background Check" means a Consumer Investigation Report procured from or furnished by a Consumer Reporting Agency that is claimed to be used for "Employment Purposes".

7)   "Run a background check" means to procure such a report from a Consumer Reporting Agency.

8)   "Employee" means an individual person as described in 26 CFR § 31.3401(c)-1.

9)   "Employer" means a party as described in 26 CFR § 31.3401(d)-1.

28

1

10)    "Onboarding" or "Onboard" means an employer beginning the actual employment of an employee. An employee may be referred to as being "Onboard", but with regard to "Background Checks" it is typically used in the context of an Employer "onboarding" an Employee.

11)    FCRA means the Fair Credit Reporting Act, 15 U.S. Code § 1681 et seq.

## Exhibits

Exhibit 1, a Graphical Diagram of The Contractual Relationship between Plaintiff, multiple intermediaries, and a Customer.

Exhibit 2, the "Background Release Form Disclosure and Consent" written by, and provided to Plaintiff by the "Engineering Vendor" that relationship that would be provided to defendant as Plaintiff's written instructions Per 15 U.S. Code § 1681b(a)(2).

Exhibit 3, Screenshot from defendant's Background Check procuring system claiming Contractor and Volunteer as "Permissible Purposes".

Exhibit 4, Screenshot from defendant's Background Check procuring system claiming Contractor and Volunteer as "Permissible Purposes".

Exhibit 5, Screenshot from defendant's website showing their slogan of "Hire Smarter-Onboard Faster".

Exhibit 6, Screenshot from defendant's support web page, for chatting with "Experts".

Exhibit 7, Transcript of chat with defendant's "expert" Nithish N.

28

1

Exhibit 8, Screenshot of Google's AI response to the question: "what will running a background check on an employee do for the business".

Exhibit 9, Text transcript from Exhibit 8.

Exhibit 10, Cover page from user guide published by defendant.

### Contractual Relationship Disrupted By Defendant

12)    Plaintiff individually was involved in a contractual relationship with a Customer, and three intermediary parties. The first intermediary party, (from right to left in the diagram below), is the Corporation that Plaintiff directs, which was paid in its corporate name, BallCam Technologies Incorporated, for the work for pay that was done by Plaintiff for the Customer. The second intermediary is by their own terminology a "consulting and solutions company", with whom Plaintiff's corporation executed a contract. The third intermediary was an Engineering Services Vendor to the Customer, in an existing vendor relationship with that Customer.

Exhibit 1, Graphical Representation Of The Contractual Relationship



### Standing

13)    Plaintiff stands in this matter because he is the ultimate and sole individual beneficiary of the revenue he generates for BallCam Technologies, and as a small business, Plaintiff is likewise individually and personally liable for guaranteeing any debts incurred by that Corporation, and as such any loss of business to that Corporation always injures Plaintiff individually

28

1

14)   Plaintiff further stands in this matter because it centers around the impermissible use of "Background Checks" in contractual business relationships. Individual persons are the target of "Background Checks" (not corporations). Because defendant causes by their business practices its customers to procure impermissible background checks relating to actual individuals, and in the instant case Plaintiff is such an individual, Plaintiff individually is the party injured therefrom.

## Background

15)   In March of 2022 Plaintiff's Corporation executed a contract with the Solutions Company for Plaintiff to perform work for the Customer, and Plaintiff began work shortly thereafter. The original contract with the Solutions Company was for six months, with the possibility for renewal at the request of the Customer. That contract was renewed multiple times, and was in progress with no scheduled end date at the time it was disrupted by the acts of defendant. As part of that contractual relationship, Plaintiff individually agreed to be managed by a third intermediary with an existing vendor relationship with the Customer. At no time did Plaintiff individually perform work for this intermediary nor receive any payment from them. Their role in the relationship was strictly managerial.

16)   During the time Plaintiff was performing work for the Customer, that company was purchased by another company, and the purchasing company now became the Customer. At some point afterward this new Customer chose not to renew the contract relationship with the Engineering Vendor which it had acquired with its purchase. Because of this, the Customer requested that some of the personnel provided or managed by that Vendor be "onboarded", or simply switched over to a similar such vendor, with a similar such relationship to the Customer, that was kept with its purchase. In short, the new owners of the Customer company chose not to keep one particular Vendor, but did choose to keep some of that Vendor's personnel, and asked them to switch over to a different Vendor, and asked that

28

other Vendor to "onboard" them. Plaintiff was one of those persons.

1

17)   As part of that "onboarding" process this new Engineering Vendor insisted that Plaintiff individually consent to a "background check", to be performed by defendant. Plaintiff was notified of this by his agent from the "Solutions Company". (Plaintiff did not deal directly with this new intermediary, rather Plaintiff's business discussions were with an agent from the "Solutions Company" which had executed a contract with Plaintiff's corporation.)

18)   Plaintiff notified this agent that he was "pretty sure" that it was illegal for the Engineering Vendor to "run a background check" on Plaintiff because he is not their employee, nor would he be in any way, and Plaintiff requested that the agent communicate that to the Engineering Vendor in order for them to determine that conclusively for themselves. Upon being given such notice, the agent from the "Solutions Company" communicated to Plaintiff that he would speak to a counterpart at the "Engineering Vendor" in order to determine how to proceed.

19)   After doing so, that agent notified Plaintiff that according to the Engineering Vendor, he must consent to a "background check" in order to be "onboarded" by them, and that according to them, it was "their legal requirement". As a result of this, Plaintiff instructed that agent to terminate without explanation all further discussion with the Engineering Vendor, and Plaintiff then notified his contact at the Customer that unfortunately he declines to be managed by this other Engineering Vendor, but that he would like to continue to perform work for the Customer indefinitely, and that he is aware that the Customer is capable of making other arrangements if they desire, and that in the mean time, Plaintiff will engage in other business activities of his Corporation.

20)   Plaintiff would not have declined to "onboard" with the second Engineering Vendor but for their insistence on performing an impermissible "background check", and at the time

28

of filing this complaint, at least, Plaintiff has cause to believe that if defendant is compelled

1

to notify that party that it is impermissible for defendant to furnish consumer reports to them in the circumstances described, that the Engineering Vendor will cease an desist making that part of their "onboarding" process, and at such time Plaintiff's can continue the work for pay relationship that he has established with the Customer, and likewise allow that Engineering Vendor to enter that relationship in the role that the customer desires of them.

21)    As such, the purpose of this complainant is to obtain Declaratory Judgment, with advancement on the calendar therefor, to remediate the disruption of business caused by defendant, and re-establish a valuable business relationship that was disrupted by them while it may still be possible.

22)    Because Plaintiff seeks to re-establish a profitable work for pay relationship with the Customer, he deliberately refrains from mentioning the names of the parties in that relationship to prevent that relationship from becoming irreparably damaged. The identity of those parties is not needed for the purposes of Plaintiff's Petition.

### Facts

23)    At no time in the contractual relationship in progress that was disrupted by defendant was Plaintiff an employee of, nor would Plaintiff individually be an employee, by any definition whatsoever, of any of the parties involved.

24)    At no time in the contractual relationship in progress that was disrupted by defendant were any of the other parties involved an employer, nor would be an employer, by any definition whatsoever, of Plaintiff individually.

25)    In the contractual relationship which Plaintiff was involved, it was the solely the Customer that was the ultimate recipient of the work performed by Plaintiff, not the

28

"Engineering Vendor", nor the Solutions Company. At no time in that contractual

1

relationship did or would Plaintiff individually perform any work whatsoever for nor be paid in any amount, by either the Engineering Vendor or the Solutions Company.

26)   At all times during the performance of work for pay by Plaintiff for that Customer, all payments for that work were made to, and would be made to BallCam Technologies Inc.

27)   At no time ever in the contractual relationship which Plaintiff was involved, did nor would any payments made by any party in the relationship to any party in the relationship, for Plaintiff's work, be reported to the IRS via form W2.

28)   BallCam Technologies Inc. is a corporation and its usual corporate purposes for profit are providing technical services to customers, and additionally engages in retail sales, and manufacturing of items for sale.

29)   Plaintiff as an individual directs his corporation, and is the sole provider of the technical services that it provides via contracts to customers. Plaintiff also manages the retail sales of the corporation, and does the manufacturing for the corporation directly, or manages any such that is outsourced. Plaintiff receives a cash payment in the amount of $1.00 per year, on a sole-proprietor basis for his work product output which the corporation provides to customers for profit. As director of the corporation Plaintiff is not an employee thereof, and as such is not paid any salary nor wages.

30)   At all times that Plaintiff individually performs valuable services for customers by and through BallCam Technologies Inc., he does so with tools and materials Paid for by BallCam Technologies Incorporated, and from facilities paid for by BallCam Technologies Incorporated. In any case where a customer does provide tools, or a facility to work from, it is strictly optional, and done for their convenience, never by necessity of the relationship. No customer of BallCam Technologies ever is required to provide tools nor a facility to

28

1    Plaintiff to work from in order to receive valuable products sold by BallCam Technologies, nor to obtain work from BallCam Technologies that is performed by Plaintiff individually.

31)    At all times in the case at hand, the Engineering Vendor to whom defendant would have furnished a consumer report, did not provide any tools of any kind nor any place to work for Plaintiff, nor was that ever to be any part of any relationship that was to take place between Plaintiff individually and that Engineering Vendor.

32)    At no time ever in Plaintiff's individual work for pay as a contractor does any party have any control over how the work is performed. The work that Plaintiff primarily does for Customers is figure out how to do things that have never been done before, at least not by or for the Customer, and that possibly no party, or at least no party currently employed by or in business with such Customers knows how to do. Original works, typically. Inventions. No one can tell any person how to figure out how to do something that has never been done before, much less how to do something that nobody knows how to do.

33)    As with any business, revenue minus expenses equals profit. BallCam Technologies Incorporated pays the expenses necessary to obtain Plaintiff's valuable services, and is paid for those services by Customers to which it provides them. Any remaining profits from revenue are used to purchase corporate assets. Typically tools, machinery, and inventory.

34)    As such, strictly speaking, Plaintiff is not an employee of any party anywhere.

35)    With regard to the question of whether Plaintiff was an employee of some party in the relationship described, it only applies to the party to whom defendant would be furnishing a consumer report. (The Engineering Vendor). Nothing whatsoever in any part of the relationship between Plaintiff individually, (the actual consumer being reported), and any

28    other party in the relationship has any relevance to the question of whether it is permissible

1

for defendant to furnish a consumer report to the Customer's Engineering Vendor in that relationship.

36)    The Customer's Engineering Vendor in that relationship was the procuring party to whom a consumer report would be furnished by defendant. Defendant does and has in the past furnished consumer reports to the Engineering Vendor regarding persons in the same and similar relationships, (i.e. contractors), and Defendant has an established business relationship with that company for doing so. This is evident from the pre-written "Instructions from the Consumer" that was presented to Plaintiff for Signature as a "Background Release Form Disclosure and Consent", (Ex. 2), which states:

In connection with my employment (including contract for service) with [redacted] (the "Company")...

37)    These pre-written instructions of the consumer indicate that defendant investigates persons who may be acting as a contractor.

38)    Defendant by its own policies, custom, and regular business practices clearly performs consumer investigations of, and furnishes consumer reports regarding persons who are acting as contractors or volunteers, and does generate revenue from doing so. (Ex. 3, 4).

39)    Defendant does advertise publicly, and informs its customers directly, that its service is for use with persons who will be acting as employees, contractors, or volunteers, and that it is permissible for its customers to procure consumer consumer reports from defendant relating to persons working as contractors or volunteers, (in addition to employees), and that it is permissible for defendant to furnish such reports regarding persons working as contractors or volunteers, (in addition to employees). (Ex. 3, 4).

28

1

## Assignment of Liability

40)    Almost certainly defendant will claim that there was no FCRA violation because no report was furnished by them and that liability falls on the Customer's "Engineering Vendor" either for attempting to procure an impermissible report, or for refusal to engage in contract without procuring an impermissible report. However such a defense would constitute an admission that procuring and furnishing consumer reports is impermissible in the sort of work for pay relationship that Plaintiff was involved in.

41)    It may be the case that Plaintiff has to sue the Customer's "Engineering Vendor" for impermissibly procuring consumer reports, however, but for defendant's business practices of impermissibly furnishing consumer reports, falsely advertising that such impermissible reports are permissible, and fraudulently obtaining payment from customers for impermissible reports by claiming that they are permissible, Plaintiff would not have to sue anyone, and simply be continuing to do the same profitable work for pay that he had been doing for over three years.

42)    Because of  defendant's business practices of impermissibly furnishing consumer reports, falsely advertising that such impermissible reports are permissible, and fraudulently obtaining payment from customers for impermissible reports by claiming that they are permissible, Plaintiff had no other choice but to decline to engage in business with the Customer's "Engineering Vendor".

43)    That was the only choice because:

Any party who procures or furnishes consumer reports in impermissible circumstances is violating the law. All ordinary standards of care compel a person not to deal in any way with parties whose business practices are unlawful.

28

1    After researching defendant's "background", it is apparent that defendant has been sued more than 1000 times for FCRA violations, with some of those cases being class-actions with many Plaintiffs, because its business practices caused irreparable harm. Clearly defendant engages in a pattern, (two or more acts), of violations of law, and many, many persons have already been irreparably harmed by that pattern of violations. Additionally, defendant has been the subject of at least one punitive CFPB action for the same reasons. Again, ordinary standards of care compel any party to avoid such liability.

Plaintiff has a Right to Privacy. Simply because other parties do not respect that Right, does not create any obligation on Plaintiff's part to consent to that conduct, nor tolerate it. Plaintiff did attempt to inform the Engineering Vendor that procuring a consumer report in the circumstances at hand was impermissible. They did not accept that notice because defendant had informed them otherwise, and because of that, they would not continue without doing so.

**Count 1: Impermissible Consumer Investigations And Reports**

44)    In the instant case there is no question whatsoever that Plaintiff was not an employee of the party procuring the background check, nor would the prospective relationship between Plaintiff individually, (the actual consumer being reported), and the party procuring the background check, ever be an employer / employee relationship. As such it is impermissible for defendant to perform a consumer investigation relating to Plaintiff, and for them to furnish a consumer investigation report relating to Plaintiff to any party in that relationship. Because in the instant case defendant both offers and promotes impermissible Background checks, and engages in the regular business of performing impermissible consumer investigations, and furnishing impermissible consumer reports, for profit, Plaintiff was presented with a procurement request for an impermissible background check by a customer of defendant. But for defendant's offering and promoting such, and doing so for profit, Plaintiff would never have received the request, nor would the requester ever had made the request. But for defendant fraudulently claiming to that party that impermissible

28

1

background checks are permissible, that party would not have continued to insist on such after being told otherwise. Because of this, Plaintiff suffered loss of valuable business. Because furnishing a consumer report relating to Plaintiff in the circumstances described is wholly impermissible, it should never have been part of the discussion in the first place. Because it was, Plaintiff had to terminate an existing and lucrative business relationship.

**Count 2: False Pretenses**

45)    Defendant Falsely claims that using their service will help their customers "Hire Smarter. Onboard Faster ®" (Ex. 5).

46)    The claim of "Hiring Smarter" is too vague to ascribe any kind of truth to it and as such it can be considered false.

47)    The claim that a customer of defendant can "Onboard Faster" by using defendant's service is blatantly false. Very simply adding an extra step to the "Onboarding" process does not lessen the time it takes to complete. It only increases it.

48)    If by their claim defendant means that it will help a customer "Onboard Faster" than if that customer used a competitors service, then that is false pretense in that it implies that using such a service is an obligatory or mandatory component of "Onboarding", when it is not. However, used as such the claim does acknowledge that Background Checks only delay the beginning of employment.

49)    Additionally while investigating defendant's service for the purposes of determining what claims they make to customers as to the reason for using it at all, Plaintiff "chatted" with a supposed "expert" from defendant's corporation, (Ex. 6, 7). This supposed "expert" stated:

28

"...background check will enhance the trust and reliability of an employee while

1

hiring..."

This claim is likewise difficult to make sense of, much less prove to be true, and as such can
be treated as false.

50)    The supposed "expert" did suggest that Plaintiff find the answer via Google. Plaintiff
did so, (Ex. 8, 9) and none of the information displayed suggested any genuine reason to use
their service at all, much less in the circumstances giving rise to this claim.

51)    Regardless of defendant's claims as to the use of its service, at all times employment
purpose Background Checks are used to disclude persons with criminal records from
employment, and to deny them contract business. That is the actual use of Background
Checks, and for defendant to misrepresent it as anything else is a false pretense.

52)    The reason that they are used as such is because in order to sell more of its service,
defendant falsely leads its customers to believe that failure to "run a background check" is
negligent hiring, and that it is against the law to not "run a background check". Neither are
true. Negligent hiring claims require that employee of an employer actually injured a third-
party, and do not apply in contractual business relations. Neither a failure to "run a
background check", nor a deliberate decision not to do so, is negligent hiring. There is no
tort nor crime of "failure to run a background check".

53)    Defendant further makes the false pretense that its service is likewise for use with
persons who will be performing work as a contractor or volunteer, (Ex. 3, 4), and does sell
its service for use with persons who will be performing work as such.

54)    These false pretenses combine with other tortious acts of defendant as described infra
to harm Plaintiff because customers of defendant who use defendant's service are falsely led

28

to believe that doing so will improve their "onboarding" process somehow when it does not,

1

and that it is for use with contractors and volunteers in addition to employees, when it is not, and for those reasons a party in Plaintiff's business relationship insisted on using it impermissibly as a requirement for engaging in contractual relations with Plaintiff, and because of this Plaintiff had to terminate a lucrative business relationship.

**Count 3: Fraudulent Business Practices**

55)   The False Pretenses alleged in Count 2 are re-alleged herein. Because the claims regarding its service and the use thereof are false, and defendant charges money for its service under those false pretenses, defendant is committing fraud.

56)   These fraudulent business practices caused Plaintiff to lose a lucrative business relationship for the same reasons stated in Count 2.

57)   Defendant fraudulently claims impermissible background checks are permissible, and charges customers money for doing them. That caused Plaintiff to lose business as described.

**Count 4: Invasion Of Contractual Relations**

58)   In the instant case, Plaintiff had an existing contractual relationship with a valued Customer. By the circumstances described supra, defendant has managed to become part of that relationship. There is no reason that they needed to be there at all. Defendant was not any kind of service provider to Plaintiff, nor any facilitator of business of any kind in the circumstances. To the party in that relationship who was their customer, defendant fraudulently represented that its service would help them as described in Count 2, and that using it with contractors is permissible, and necessary. To Plaintiff, at all times, defendant is only an interfering party in an existing business relationship. In no way does defendant bring nor offer anything of value whatsoever to Plaintiff, nor to his contractual relationship with a

28   customer. Rather in the circumstances of Plaintiff's contractual relationship described herein,

1     defendant only brings liability, delay, conflict, dispute, disruption, and loss thereof. As such,

defendant's mere presence in the relationship is totally toxic to that relationship, and cause to

enjoin them therefrom.

### Count 5: Interfering With Business Relations

59)    Count 4 is restated herein, with the addition that defendant's invasion of contractual

relations caused those relations to be terminated. As stated in Count 4, defendant's mere

presence in Plaintiff's contractual relationship is tortious in-se, and thereby did cause a

valuable business relationship between other parties to terminate, when it would not have,

but for their presence therein.

### Count 6: Defective Commercial Services – Third Party Damages

60)    A "Background Check" is not considered a "Product" for the purpose of Defective

Product claims, but instead is treated as a commercial service. This count applies third-party

Defective Product type claims to commercial services.

61)    In short, defendant's commercial service does nothing of benefit to its customers, and

in all cases causes harm to others as in Plaintiff's case.

62)    Defendant fails to make any kind of specific claim as to the value or necessity of its

service, but instead only makes vague general circumspect claims as to its value or

necessity, or outright false ones. At all times those claims are false pretenses as stated in

Count 2, to mask the true purpose of its service which is to impose collateral consequences

on persons who have been charged with crimes by causing them to be discluded from

employment by employers and from doing contract business with customers.

63)    Because the actual stated value or necessity of its service is so vague and general as to

28    be false, or is outright false, the service cannot do anything for any party that it supposedly

1    claims. Moreover, defendant fails to state how their service will do what they say it does,

because ultimately it does not, so there is way they can show the relation between claims

and results. As such the service is one that does not do as claimed, and causes harm to others

as described in this matter.

**Count 7: Malicious Commercial Services – Third Party Damages**

64)    As stated supra the whole purpose of defendant's service is to disclude certain persons

from employment and contract relationships.

65)    Employers may disclude a particular person or persons from employment within the

scope of employment law. Likewise, customers have no obligation whatsoever to do

business with anyone.

66)    Defendant's service is malicious because at all times it is used for disclusive purposes,

not evaluative purposes. In short it is a service for the use by employers to terminate the

employment of a particular person, or to deny them employment. While this may not harm

the user of the service, it clearly harms third-parties, namely those whose employment was

terminated, and those denied employment.

67)    Because of the malicious nature of defendant's service, its users must present an

unlawful consent form to the consumer they wish to investigate in order to avoid serious

consequences.

68)    Additionally, and by false pretense, users of defendant's service "obtain" the written

instructions of the consumer they investigate by writing those instructions in their favor, and

then presenting those pre-written "instructions of the consumer" to that consumer as a

"consent form". "Instruction" and "Consent" have two separate meanings, and to take

28    advantage of a consumer by telling them they are consenting to something when what is

1  really taking place is that they are being deceitfully induced into forfeiting Rights and lawful protections of the FCRA, solely for the benefit of the user of defendant's service, and at the loss of the consumer being investigated, makes defendant's service a malicious commercial service.

**Count 8: Unjust Enrichment**

69)   Defendant unjustly enriches itself by engaging in the business of offering impermisible Background Checks, and performing impermissible background checks for a fee, and by fraudulently claiming that such background checks are permissible. This causes persons similarly situated to Plaintiff to either lose Business or lose Privacy. Both are items of value. No matter what the ultimate outcome of a Background Check, defendant always enriches itself by them being performed, and the individual person who is the subject of that background check, the consumer, always loses something of value thereby. In the instant case Plaintiff lost a valuable business relationship with a paying customer, due to the acts of defendant, while defendant maintained its valuable business relationship with its paying customer by that same conduct, a party who was not, nor would be paying Plaintiff anything. Defendant enriched itself and continues to enrich itself by fraudulently claiming to its customers that impermissible background checks are permissible, and continues to receive revenue thereby, while persons in Plaintiff's circumstances will lose either Business or Privacy because of the fraudulent claims made by defendant to its customers.

**Count 9: Willful Non-Compliance With FCRA**

70)   The FCRA requires defendant to provide copies of a consumer's consumer file to the consumer. The details of doing so are typically left to defendant. Because of that, they deliberately do not provide a copy of a consumer's file nor any report relating to that consumer to the consumer before the report is given to the procurer. Defendant does this in order to maintain the value of its service to its customers. As stated supra, defendant's

28  service is used for disclusive purposes. If a consumer receives a copy of a report before it is

1   furnished to the procurer, they can withdraw their consent, or instruct defendant to modify the report, ultimately denying defendant's customer the specific information they paid defendant to furnish. As such defendant's service becomes worthless, and almost certainly in such a case, a customer of defendant's would still have to have payed for it. A service that is ultimately worthless, yet one still has to pay for, is an extremely unattractive offering.

71)   Because of this, defendant complies with the FCRA to the minimum amount they can, in order to keep their service desirable to its customers, and profitable to defendant. Defendant's own publication,  (https://fadv.com/about-us/), states that one of its "Principles" is to "Put the customer first." While this may be an ordinary standard of care in service businesses, given the nature of defendant's business, putting FCRA compliance first, would be better practice.

72)   As such willful non-compliance with any portion the FCRA is actionable, and per 15 U.S. Code § 1681(a)(4) defendant has a duty of care to act with "fairness, impartiality, and a respect for the consumer's right to privacy."

73)   Defendant not providing a consumer an opportunity to view, verify and possibly deny or modify a report relating to them before it is used against them is certainly not "fair".

74)   Defendant willfully providing its service to its customers in a manner that benefits its customers over the consumer, and at the loss of the consumer, is not "impartial".

75)   Defendant allowing its customers to write the "instructions of the consumer", and accepting such from its customers, is wholly disrespectful of a consumer's Right to Privacy.

76)   As stated supra, Defendant knowingly and willfully investigates consumers who will
28   be working for pay as contractors, or volunteering for free, and furnishes reports relating to

1  these persons to its customers, for profit. This is a violation of 15 U.S. Code § 1681b(a).

**Count 10: Negligent Non-Compliance With FCRA**

77)  Not providing a copy of a procured report to the consumer to which it relates, prior to providing it to the procurer, is negligent because there is simply no legitimate reason not to, and doing so would prevent the consumer from suffering damages, and likewise prevent defendant from being sued for those damages, which it has been, many, many times. Everything in the legitimate furnishing of consumer reports hinges on them being true and accurate. Allowing a false or inaccurate report to be delivered to a procurer thereof when an opportunity existed to correct it prior, is gross negligence.

78)  Defendant's negligence as such violates 15 U.S. Code § 1681(a)(4) for the same reasons as stated in Count 9.

**Count 11: Interfering With Commerce**

79)  In the case at hand, Plaintiff's Corporation was unquestionably engaging in commerce. The relationship in place was unquestionably a Business to Business relationship. Making a "Background Check" any part of a corporation engaging in commerce constitutes interfering with that commerce. Defendant, by its business practices interferes with corporations acting in commerce as Plaintiff's does, and did interfere with Plaintiff's corporation engaging in commerce, by its businesses practices as described in this Complaint.

**Count 12: Questions For Clarification**

80)  As part of his investigation of defendant's business practices, Plaintiff created a user account in defendant's Background Check Procurement Site: https://www.sterlingcheck.com/ , and initiated a Background Check on Piero Bugoni, for employment purposes by BallCam Technologies Incorporated. However, upon reflection

28  Plaintiff realized, as stated herein, he individually is not an employee of any party. His

1

business relationship with BallCam Technologies is probably best described as a self-contracting sole-proprietor. As such, it occurred to Plaintiff that it might be impermissible for Plaintiff to run a background check on himself for employment purposes. Because of that, he canceled the request for such a report from defendant, and took no further action toward it. Plaintiff puts that question to the Court.

81)   Along those same lines, it occurred to Plaintiff that he could use his Corporation, or a new one created specifically for that purpose, to run Background Checks on others, for them to view pre-emptively, when seeking employment, rental or credit, for the purpose of accordingly instructing the agencies that furnish them to prospective employers, landlords, and creditors.

82)   Since Plaintiff is now out of work, he had to come up with something. As such he registered the domains: AnnualBackGroundReport.com and ClearYourBackground.com. The first is simply for the purpose of assisting persons with obtaining free annual copies of background checks, similar to **annualcreditreport.com**. The second is for the purpose of assisting consumers with accordingly instructing the agencies that furnish reports relating to them. For that purpose, it occurred to Plaintiff that for a consumer to be able to "run a Background Check" on themselves is a useful tool, in addition to a full file disclosure, because it allows a consumer to view a report relating to them as it would appear to a procurer thereof for employment purposes, rental purposes, or credit purposes as applicable. Because of defendant's business practices, and similar practices by other Consumer Reporting Agencies, there appears to be a Profit to be made therefrom.

Argument In Favor of FCRA Permissibility For These Questions:

83)   The Courts routinely treat the sort of "consent forms" as in Exhibit 2, as the "written instructions of the consumer", relating to them, and it appears that a consumer can literally

28   waive all protections of the FCRA by the language of those "instructions". As such they

1

should be able to instruct a Consumer Reporting Agency to furnish reports to them personally exactly as they would be furnished to employers, landlords, and creditors, as opposed to full file disclosures, in order that the consumer can verify the correctness and accuracy of the reports as they are actually furnished to others.

84) For Employment Purposes at least, looking for work can be considered self-employment, and as such, consumers should be able to run Background Checks on themselves, to see if they would hire somebody like them, and if not, accordingly instruct Consumer Reporting Agencies to report on them so that they would.

### Relief Requested

85) Advancement upon the Calendar of this matter for speedy hearing by This Court.

86) Declaratory Judgment by The Court that Plaintiff was not an employee of any party in the work for pay relationship that was disrupted by the business practices of defendant.

87) Declaratory Judgment that the FCRA explicitly prohibits defendant from furnishing a consumer report relating to Plaintiff to any party in the work for pay relationship described herein.

88) Declaratory Judgment that Plaintiff has a Right to bring suit for damages caused by defendant's conduct alleged in Count 1, Plaintiff's Impermissible Purpose claim.

89) Declaratory Judgment that Plaintiff has a Right to bring suit for damages for each and every other Count alleged against defendant in this matter.

90) Declaratory Judgment that within the FCRA, "Employer" means the actual paying

28   party in a work for pay relationship, per 26 CFR § 31.3401(d)-1, where payments made to

1   the work performer in that relationship are or will be reported to the IRS via Form W2.

91)   Declaratory Judgment that within the FCRA "Employee" means the actual work performer in a work for pay relationship per 26 CFR § 31.3401(c)-1, whose payments for work are or will be reported to the IRS by the Employer via Form W2.

92)   Declaratory Judgment that per the FCRA, "Employee" never means a person who volunteers and is not paid.

93)   Declaratory Judgment that within the FCRA, "Employee" never includes any person in a work for pay relationship as Plaintiff's described herein.

94)   Declaratory Judgment that within the FCRA it is never permissible for defendant to furnish a consumer report to any party for whom the consumer does or will be performing work for pay in a relationship where the paying party reports or will report those payments to the IRS via Form 1099.

95)   Declaratory Judgment that nothing in the FCRA ever intended "Employment" to include work for pay by contractors, nor work for free by volunteers.

96)   Declaratory Judgment that nothing in the FCRA does ever nor did ever give leave to consumer reporting agencies to extend nor construe for any reason, the definition of "Employment" or "Employee" to include contractors or volunteers.

97)   Declaratory Judgment that nothing in the FCRA does ever nor did ever give leave to any procuring party to extend nor construe it for any reason whatsoever, to permit them to procure consumer reports relating to consumers who will be performing work for the

28   procuring party as a contractor or volunteer.

1

98) Declaratory Judgment that it is not impermissible per the FCRA for a person to use a business they operate to procure a consumer report relating to them, for employment, credit, or rental purposes, as they would be furnished to others for the same purposes.

99) Declaratory Judgment that it is not impermissible per the FCRA for a person to operate a business for the purpose of assisting consumers with procuring reports relating to themselves from Consumer Reporting Agencies, as they would be procured by other parties.

100) Declaratory Judgment that Plaintiff is entitled to compensation for his time and effort expended in successfully prosecuting this matter at the same rate as any "reasonable attorney" would charge to do same.

101) Any and all clarification that This Court may give as to the permissibility of furnishing consumer reports relating to consumers who work or will be working for pay as contractors, and who work or will be working for free as volunteers.

Submitted to the Court, This ___ Day _____, 20___.

_____

Mr. Piero A. Bugoni, Plaintiff Pro - Se

Certificate of Filing and Delivery:

The Original of This Document was delivered to the Court on _____, by Plaintiff and Petitioner, via United States First Class Mail.

28